## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JENNIFER SKINNER, | : Civ. No.  1:24-CV-1725 |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : (Chief Magistrate Judge Bloom) |
| FRANK BISIGNANO, | : |
| Commissioner of Social Security, | : |
| | : |
| Defendant. | : |

### MEMORANDUM OPINION

## I.  Introduction

Jennifer Skinner filed a Title II application for a period of disability and disability insurance benefits on December 23, 2021.[1]  Following an initial hearing before an Administrative Law Judge ("ALJ"), the ALJ found that Skinner was not disabled from her alleged onset date of disability of December 22, 2021, through November 16, 2023, the date of the ALJ's decision.[2]

Skinner now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence.  After a review of the record,

---

[1] Tr. 15.

[2] Tr. 15-30.

and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'"[3] we conclude that substantial evidence supported the ALJ's findings in this case. Therefore, we will affirm the decision of the Commissioner denying this claim.

## II.    Statement of Facts and of the Case

On December 23, 2021, Skinner applied for disability insurance benefits, citing an array of physical impairments, including Turner syndrome, type one diabetes, thyroid disease, and high blood pressure.[4] Skinner was 43 years old at the time of the alleged onset of disability, had at least a high school education, and had past employment as a cashier.[5]

With respect to these alleged impairments the record revealed the following: The earliest relevant records are from Skinner's virtual outpatient visit with Dr. David Macaluso in March of 2021 for an

---

[3] *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

[4] Tr. 200.

[5] Tr. 36-69.

2

endocrinology follow-up appointment.[6]  She explained to Dr. Macaluso her impairments of and medications for type one diabetes mellitus, Turner syndrome, vitamin D deficiency, osteomalacia, osteopenia, and hypothyroidism.[7]

In June of 2021, Skinner presented to the emergency department after a syncopal episode at work.  Skinner reported feeling very tired when she woke up.[8]  She received a differential diagnosis of syncope, dehydration, hypoglycemia, and cardiac arrhythmia.[9]  Skinner again presented to the emergency department in October of 2021 following another syncopal episode at work.[10]  That same month, Skinner underwent a tilt table evaluation that indicated symptoms consistent with orthostatic hypotension with provoked syncope after nitroglycerin.[11]

---

[6] Tr. 326-28.

[7] *Id.*

[8] Tr. 357-62.

[9] Tr. 361.

[10] Tr. 448.

[11] Tr. 446-47

Skinner experienced another syncopal episode in December of 2021 while at work, which caused her to fall and sustain a fractured nose.[12]

In January of 2022, Skinner appeared for a neurology outpatient consultation with Dr. Muhamad Salman Siddiqi for further assessment of her reoccurring syncopal episodes.[13]  Dr. Siddiqi ordered a brain MRI, a head and neck CT, and a EEG.[14]  The EEG returned abnormal results and showed "infrequent left temporal sharp waves with propencity to develop seizures."[15]  As a result, Skinner was placed on antiepileptic medication.[16]  The MRI revealed small enhancing heterogeneous lesions on the left side calvarium.[17]  Skinner was referred to Dr. Gregory Arnone for a neurosurgery consultation.[18]  During her consultation with Dr. Arnone, Skinner reported feeling normal with the exception of her

---

[12] Tr. 430-35.

[13] Tr. 419-24.

[14] Tr. 424.

[15] Tr. 418-19.

[16] Tr. 419.

[17] Tr. 417.

[18] *Id.*

syncopal episodes.[19]  Dr. Arnone reviewed Skinner's imaging and noted a lack of concern over the appearance of the lesions.[20]  He ordered a nuclear med bone scan to assess for any further lesions, which showed uptake in the left parietal lesion and three additional lesions in the skull and an additional lesion in the ribs.[21]

In August of 2022, Skinner appeared for a neurology visit with Certified Physician Assistant ("PA-C") John Dinma Chukwudifu Jr.[22] Skinner reported that a syncopal episode occurred a week prior with a 15-minute postictal.[23]    PA-C Chukwudifu increased Skinner's antiepileptic medication and ordered an Magnetic Resonance Angiogram ("MRA") of the head and neck.[24]  Around this time, Skinner received a brain MRI, which showed, *inter alia*, a small area stroke in the left

---

[19] Tr. 411.

[20] Tr. 414.

[21] Tr. 407, 414.

[22] Tr. 759.

[23] *Id.*

[24] Tr. 762.

5

parietal region.[25]    Skinner's head MRA reported 60-70% carotid stenosis

on the right and intracranial atherosclerotic disease which is mild.[26]

In September of 2022, Skinner was transported to the emergency

department following a seizure.[27]    Skinner's mother reported that the

seizure lasted about one minute.[28]    Skinner was discharged with a

diagnosis of generalized epilepsy and instructed to follow up with her

neurologist.[29]    During a follow-up visit with PA-C Chukwudifu in May of

2023, Skinner reported a syncopal episode occurred a month prior to the

visit.[30]

It is against this factual backdrop that the ALJ conducted a hearing

in Skinner's case on September 29, 2023.[31]    Skinner, her mother, and a

vocational expert ("VE") each testified at this hearing.    Skinner testified

about her treatment, the varying nature of her syncopal episodes, her

---

[25] Tr. 755, 757.

[26] Tr. 750.

[27] Tr. 741.

[28] Tr. 742.

[29] Tr. 744.

[30] Tr. 1025-26.

[31] Tr. 36-69.

difficulties balancing and lifting things, her inability to handle loud music or vibrations, and her activities of daily living.[32]  Skinner's mother testified about her observations of Skinner when a syncopal episode occurs.[33]  The VE in her testimony first classified Skinner's past work, then answered hypothetical questions about an individual with Skinner's background and specific types of limitations.[34]  On November 9, 2023, Skinner's counsel informed the ALJ that she experienced another seizure the day prior to the hearing.[35]

Following this hearing, on November 16, 2023, the ALJ issued a decision denying Skinner's application for benefits.[36]  In that decision, the ALJ first concluded that Skinner met the insured status requirement through December 31, 2025.[37]  At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found Skinner suffered from the

---

[32] Tr. 42-68.

[33] Tr. 58-63.

[34] Tr. 63-68.

[35] Tr. 316.

[36] Tr. 15-30.

[37] Tr. 17.

following severe impairments: seizure disorder, syncope, orthostatic, hypertension, brain lesions, Turner syndrome, and diabetes Type One.[38] At Step 3 the ALJ determined that Skinner did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.[39]

Between Steps 3 and 4 the ALJ concluded that Skinner retained the following residual functional capacity to:

> [P]erform light work as defined in 20 CFR 404.1567(b) subject to the following: never climb ladders, ropes, or scaffolds, work at unprotected heights, contact moving mechanical parts, or operate a motor vehicle; can frequently climb ramps or stairs or balance; can tolerate occasional exposure to temperature extremes, humidity, wetness, vibration, or concentrated dust, fumes, or gases; requires a no loud noise work environment; a[n]d can maintain concentration, persistence, and pace for two hour segments sufficient to perform routine two to three step tasks or instructions.[40]

In reaching this RFC determination, the ALJ made the following findings: the ALJ considered Skinner's reported, subjective symptoms, and found that "claimant's medically determinable impairments could

---

[38] Tr. 17-19.

[39] Tr. 20-21.

[40] Tr. 21-28.

reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]"[41]   The ALJ then embarked on a lengthy review of the medical record evidence he found supported those findings.[42]

The ALJ then found at Step 4 that Skinner could not perform her past work but, at Step 5, found that she could perform other occupations with jobs that existed in significant numbers in the national economy, such as router, marker, and collator operator.[43]   Having reached these conclusions, the ALJ determined that Skinner had not met the demanding showing necessary to sustain this claim for benefits and denied this claim.

This appeal followed.[44]   On appeal, Skinner challenges the adequacy of the ALJ's decision arguing it is not supported by substantial

---

[41] Tr. 22.

[42] Tr. 22-28.

[43] Tr. 28-29.

[44] Doc. 1.

evidence.[45]  As discussed in greater detail below, having considered the arguments of counsel and carefully reviewed the record, we conclude that the ALJ's decision should be affirmed, and this appeal denied.

## III.  Discussion

### A. Substantial Evidence Review – the Role of this Court

This Court's review of the Commissioner's decision to deny benefits is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.[46]  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[47]  Substantial evidence means less than a preponderance of the evidence but more than a mere scintilla.[48]

A single piece of evidence is not substantial evidence if the ALJ "ignores, or fails to resolve, a conflict created by countervailing

---

[45] Doc. 14.

[46] *See* 42 U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012).

[47] *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

[48] *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

evidence."[49]    However, where there has been an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence."[50]    The court must "scrutinize the record as a whole" to determine if the decision is supported by substantial evidence.[51]

The Supreme Court has explained the limited scope of our review, noting that "[substantial evidence] means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[52]    Under this standard, we must look to the existing administrative record to determine if there is "'sufficient

---

[49] *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)) (internal quotations omitted).

[50] *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).

[51] *Leslie v. Barnhart*, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003).

[52] *Biestek*, 139 S. Ct. at 1154 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

evidence' to support the agency's factual determinations."[53]  Thus, the question before us is not whether the claimant is disabled, but rather whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was based upon a correct application of the law.[54]

When conducting this review, we must remain mindful that "we must not substitute our own judgment for that of the fact finder."[55]  Thus, we cannot re-weigh the evidence. Instead, we must determine whether there is substantial evidence to support the ALJ's findings.  In doing so, we must also determine whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must

---

[53] *Id.*

[54] *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

[55] *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)).

articulate the reasons for his decision.[56]  This does not require the ALJ to use "magic" words, but rather the ALJ must discuss the evidence and explain the reasoning behind his or her decision with more than just conclusory statements.[57]   Ultimately, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests."[58]

## B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive disability benefits under the Social Security Act, a claimant must show that he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months."[59]  This requires a claimant to show a severe physical or

---

[56] *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000).

[57] *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted).

[58] *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

[59] 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §§404.1505(a), 416.905(a).

mental impairment that precludes him or her from engaging in previous work or "any other substantial gainful work which exists in the national economy."[60]   To receive benefits under Title II of the Social Security Act, a claimant must show that he or she is under retirement age, contributed to the insurance program, and became disabled prior to the date on which he or she was last insured.[61]

In making this determination, the ALJ follows a five-step evaluation.[62]   The ALJ must sequentially determine whether the claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has a severe impairment that meets or equals a listed impairment; (4) is able to do his or her past relevant work; and (5) is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").[63]

---

[60]  42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a).

[61] 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

[62] 20 C.F.R. §§404.1520(a), 416.920(a).

[63]20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also determine the claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."[64] In making this assessment, the ALJ must consider all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.[65] Our review of the ALJ's determination of the plaintiff's RFC is deferential, and that determination will not be set aside if it is supported by substantial evidence.[66]

The claimant bears the burden at Steps 1 through 4 to show a medically determinable impairment that prevents him or her from engaging in any past relevant work.[67] If met, the burden then shifts to the Commissioner to show at Step 5 that there are jobs in significant numbers in the national economy that the claimant can perform

---

[64] *Burnett*, 220 F.3d at 121 (citations omitted); *see also* 20 C.F.R. § 404.1545(a)(1).

[65] 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

[66] *Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002).

[67] *Mason*, 994 F.2d at 1064.

15

consistent with the claimant's RFC, age, education, and work experience.[68]

With respect to the RFC determination, courts have followed different paths when considering the impact of medical opinion evidence on this determination. While some courts emphasize the necessity of medical opinion evidence to craft a claimant's RFC, other courts have taken the approach that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC."[69]  Additionally, in cases that involve no credible medical opinion evidence, courts have held that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided."[70]

Given these differing approaches, we must evaluate the factual context underlying an ALJ's decision. Cases that emphasize the

---

[68] 20 C.F.R. §§404.1512(f), 416.912(f); *Mason*, 994 F.2d at 1064.

[69] *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006); *see also Biller v. Acting Comm'r of Soc. Sec.,* 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013).

[70] *Cummings v. Colvin*, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

importance of medical opinion support for an RFC assessment typically arise in the factual setting where well-supported medical sources have found limitations to support a disability claim, but an ALJ has rejected the medical opinion based upon an assessment of other evidence.[71] These cases simply restate the notion that medical opinions are entitled to careful consideration when making a disability determination. On the other hand, when no medical opinion supports a disability finding or when an ALJ relies upon other evidence to fashion an RFC, courts have routinely sustained the ALJ's exercise of independent judgment based upon all the facts and evidence.[72] Ultimately, it is our task to determine, considering the entire record, whether the RFC determination is supported by substantial evidence.[73]

---

[71] *Biller*, 962 F. Supp. 2d at 778–79.

[72] *See Titterington*, 174 F. App'x 6; *Cummings,* 129 F. Supp. 3d at 214–15.

[73] *Burns,* 312 F.3d 113.

## C. Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms

For applications filed after March of 2017, the regulations require ALJs to consider several factors to determine the persuasiveness of a medical opinion: supportability, consistency, relationship with the claimant, specialization, and other factors tending to support or contradict a medical opinion.[74]  Supportability and consistency are the two most important factors, and an ALJ must explain how these factors were considered in his or her written decision.[75]  Supportability means "[t]he more relevant the objective medical evidence and supporting explanations . . . are to support his or her medical opinion(s) . . . . the more persuasive the medical opinions . . . will be."[76]  The consistency factor focuses on how consistent the opinion is "with the evidence from other medical sources and nonmedical sources."[77]

---

[74] 20 C.F.R. § 404.1520c(c).

[75] 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *Blackman v. Kijakazi*, 615 F. Supp. 3d 308, 316 (E.D. Pa. 2022).

[76] 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[77] 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

While there is an undeniable medical aspect to the evaluation of medical opinions, it is well settled that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations."[78]  When confronted with several medical opinions, the ALJ can choose to credit certain opinions over others but "cannot reject evidence for no reason or for the wrong reason."[79]  Further, the ALJ can credit parts of an opinion without giving credit to the whole opinion and may formulate a claimant's RFC based on different parts of different medical opinions, so long as the rationale behind the decision is adequately articulated.[80]   On the other hand, in cases where no medical opinion credibly supports the claimant's allegations, "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided."[81]

---

[78] *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).

[79] *Mason*, 994 F.2d at 1066.

[80] *See Durden v. Colvin*, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016).

[81] *Cummings*, 129 F. Supp. 3d at 214–15.

19

### D. This Case Will Be Affirmed.

Our review of the ALJ's decision denying an application for benefits is significantly deferential.  Our task is simply to determine whether the ALJ's decision is supported by substantial evidence in the record; that is "only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[82]  Judged against this deferential standard of review, we conclude that substantial evidence supported the ALJ's decision in this case.

Skinner first argues that the ALJ failed to identify a significant number of jobs that she can perform.[83]  The ALJ found that Skinner could perform three occupations: marker (DOT 209.587-034, 1991 WL 671802), router (DOT 222.587-038, 1991 WL 672123), and collator operator (DOT 208.685-010, 1991 WL 671753).[84]  Skinner claims the jobs of a marker and router are outdated and obsolete, and the functions of a collator

---

[82] *Biestek*, 139 S. Ct. at 1154.

[83] Doc. 14 at 9-13.

[84] Tr. 29.

operator directly conflict with the ALJ's finding that she refrain from moving mechanical parts.[85]

Specifically, Skinner argues that the job of a marker is "performed differently in today's workforce than described by the . . . [Dictionary of Occupational Titles ("DOT")]" and is "performed at the semiskilled to skilled levels" according to the Occupational Information Network ("O*NET").[86]  However, courts in our circuit "have been hesitant to reject the testimony of Vocational Experts relying upon the DOT in favor of the descriptions on O*NET, given the fact that 'Social Security Ruling 00-4P sets forth that the relevant inquiry is whether VE testimony is consistent with the DOT.'"[87]  "[T]he regulations simply do not require a [Vocational Expert's] testimony to be consistent with O*Net."[88]  We agree with this body of caselaw and conclude that the ALJ fulfilled his requirement under the controlling regulations.

---

[85] Doc. 14 at 11-12.

[86] *Id.* at 9-10.

[87] *Pollock v. O'Malley*, No. 1:22-cv-1856, 2024 WL 4803530, at *19 (M.D. Pa. Nov. 15, 2024) (collecting cases).

[88] *Id.* at *20.

As to the job of a router, Skinner relies on *Kelly P. v. Saul*[89] in arguing that the occupation is obsolete due to technological advances of which the DOT fails to consider.    While the out-of-circuit caselaw recognized the "possibility that the description [of a router] was outdated," it also noted that it "is inadequate to find that the occupation of router, as it is described in the DOT, is completely obsolete."[90]  Rather, it relied on binding precedent to conclude that technological advances have likely led to a reduction in the number of router jobs and that even a "modest reduction of [] 28,000 jobs . . . would mean that the number of available jobs is no longer significant."[91]  However, "there is no precise estimate for what constitutes 'significant numbers' of jobs under the Social Security Act."[92]  Here, the ALJ identified two other jobs with over 136,000 and 33,000 national positions, respectively.[93]  We find this

---

[89] No. 5:18-cv-777, 2019 WL 3573591, at *5–6 (S.D. Cal. Aug. 6, 2019).

[90] *Id.*

[91] *Id.*

[92] *Young v. Astrue*, 519 F. App'x 769, 772 (3d Cir. 2013).

[93] Tr. 65.

satisfies the Commissioner's requirement to identify jobs that exist in significant numbers in the national economy.[94]

Skinner also relies on the DOT and O*NET in alleging that certain details of a collator operator are incompatible with her limitation to avoid work around "moving mechanical parts."[95]  But as noted above, adherence to the descriptions on O*NET is not required.[96]  Additionally, it is not necessary to look to narrative descriptions in the DOT to determine if an occupation involved moving mechanical parts, because the DOT states whether any occupation therein involves moving mechanical parts.  The DOT is unambiguous that the occupation of collator operator does not involve moving mechanical parts.[97]  Skinner's argument is therefore without factual support and so is unavailing.

---

[94] *See Young*, 519 F. App'x at 772 (finding that 20,000 available jobs sufficient to establish work exists in significant numbers).

[95] Doc. 14 at 11-12.

[96] *Pollock*, 2024 WL 4803530, at *20.

[97] *See* 1991 WL 671753.

Skinner's second contention is that the ALJ erred in failing to address her need to lie down and nap during the day.[98]  While Skinner argues that the ALJ did not consider this evidence, the ALJ did note Skinner's testimony of her tiredness and need to rest at times during the day when discussing her symptoms, as well as the medical evidence showing that Skinner denied experiencing fatigue during the relevant period.[99]  Ultimately, the ALJ determined that Skinner was not as limited as she alleged because her allegations were not entirely credible or supported by the objective medical evidence.  Thus, while Skinner contends that the ALJ failed to include a limitation to account for her need to nap, the ALJ need only include a claimant's credibly established limitations in the RFC.[100]  Accordingly, we conclude that the ALJ's RFC determination is supported by substantial evidence.

Finally, Skinner argues the ALJ made errors in evaluating her reported symptoms.[101]  Skinner alleges the ALJ improperly noted she

---

[98] Doc. 14 at 13-14.

[99] Tr. 21-23.

[100] *See Rutherford*, 399 F.3d at 554.

[101] Doc. 14 at 14-17.

was in no acute distress during medical visits, failed to provide sufficient reasoning in finding that her statements were inconsistent with the medical evidence, and failed to consider her consistent work history.

Skinner's argument that the ALJ improperly noted that she was not in acute distress at her medical visits is unavailing. Indeed, the ALJ did report several instances in which the medical record noted Skinner to be in "no acute distress,"[102] but there is nothing in the decision suggesting the ALJ improperly interpreted that evidence. It is indisputable that the notes in the medical record of "no acute distress" are merely listed in the ALJ's decision as being contained in the medical record.[103] Skinner seemingly believes the ALJ's references to these notes somehow show he improperly made further inferences, but she does not explain what inferences the ALJ made, where such inferences are located in the text of the decision, nor why such inferences are inappropriate, and so this argument fails.

---

[102] Tr. 23.

[103] *See id.*

25

As to the argument that the ALJ found Skinner's alleged symptoms to be inconsistent with the objective medical evidence without explanation, we discern no error in the ALJ's evaluation. The ALJ did not simply make such a conclusion without proper articulation. The ALJ discussed the evidence at length, including both abnormal and normal medical findings. These findings included, *inter alia*, Skinner's reports of syncopal episodes and seizures, as well as abnormal medical findings such as her blood pressure readings, EEG testing, cardiac testing, tilt table testing, and brain MRI results.[104]  Ultimately, while the ALJ acknowledged the abnormal findings during the relevant time, the ALJ explained that the record as a whole did not demonstrate that Skinner was as limited as she alleged.[105]  Accordingly, we find the ALJ's finding of Skinner's allegations to be supported by substantial evidence.

Lastly, Skinner argues the ALJ erred in failing to consider her consistent work history because it constituted favorable evidence that required consideration. We find this claim is without merit. Indeed, the

---

[104] Tr. 22.

[105] Tr. 22-28.

ALJ referenced Skinner's work history as a cashier in his decision and considered a report completed by her former employer.[106]   In reading the decision as a whole,[107] we find that the ALJ simply found that Skinner's work history did not outweigh the objective medical evidence. In any event, Skinner also fails to identify how prejudice inured from such alleged error.   Social Security appeals are subject to harmless error analysis.[108]   Under the harmless error analysis, a remand is warranted only if the error "prejudices a party's 'substantial rights'"; that is, if the error "likely affects the outcome of the proceeding, . . ."[109]   Skinner's argument fails to demonstrate prejudice occurred, and so, even assuming *arguendo* that it was an error, we hold now it was harmless.

Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we conclude that

---

[106] Tr. 27-28

[107] *Leslie*, 304 F. Supp. 2d at 627.

[108] *See Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016).

[109] *Hyer v. Colvin*, 72 F. Supp. 3d 479, 494 (D. Del. 2014).

substantial evidence supported the ALJ's evaluation of this case, and this decision should be affirmed.

## IV. <u>Conclusion</u>

For the foregoing reasons, the decision of the Commissioner in this case will be AFFIRMED, and the plaintiff's appeal denied.

An appropriate order follows.

Submitted this 20th day of January 2026.

<u>*s/ Daryl F. Bloom*</u>
Daryl F. Bloom
Chief United States Magistrate Judge